**2026 UT App 115**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ASAEL PAUL LYMAN,
Appellant.

Opinion
No. 20240894-CA
Filed July 30, 2026

Third District Court, West Jordan Department
The Honorable James D. Gardner
No. 231904629

Nathalie S. Skibine, Attorney for Appellant

Derek E. Brown and Daniel W. Boyer,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Asael Paul Lyman was convicted of negligently operating a vehicle resulting in death, driving under the influence, failure to stay in one lane, speeding, and failure to obey a traffic control device. He now appeals his conviction of negligently operating a vehicle resulting in death. He argues that the trial court erred in denying his motion for a directed verdict and his motion to arrest judgment, both based on an assertion of insufficient evidence presented by the State. He also raises challenges regarding jury instructions and regarding the court's refusal to allow certain testimony by his son. We disagree as to each argument and therefore affirm Lyman's conviction.

BACKGROUND

*The Collision*

¶2     Lyman, an admitted alcoholic, usually drank three to four tumbler glasses (each three to four fingers full) of whiskey every night. At about 3:30 a.m. on December 1, 2022, Lyman briefly awoke to let his dogs outside, had yet another glass of whiskey (beyond his customary drinks from the prior evening), and then returned to bed. Lyman arose later that morning at about 8:00 a.m., and then he left at about 11:30 a.m. in his truck to pick up his grandson from kindergarten. But on his way back home after retrieving his grandson, Lyman collided with another vehicle.

¶3     Lyman was travelling northbound on Bangerter Highway, which had a posted speed limit of 55 miles per hour, and proceeded to take the 9000 South off-ramp near his home. Lyman's truck moved into the left lane of the off-ramp, passed the vehicle that had been immediately in front of him, veered back into the right lane, and then made contact with the concrete barrier to the right side of the off-ramp. Lyman's truck then straightened out and proceeded forward toward the end of the off-ramp, where there was a low concrete divider separating the lanes, forcing either a left or right turn, and where the traffic lights were currently red. Lyman's truck nonetheless proceeded over the concrete divider into the intersection and collided with another truck, sending that truck flying off the road, through a chain link fence, and into a shed.

¶4     A tow truck driver who had witnessed the crash and called 911 approached Lyman's truck to see if he needed medical attention. The tow truck driver found Lyman conscious and asked if he needed medical attention, but Lyman simply shook his head "no." The tow truck driver asked if Lyman's grandson, who was "crying hysterically" in the back seat, needed medical attention, and Lyman again simply shook his head.

¶5      The first officer to arrive at the scene approached the truck Lyman had hit and tried to make contact with its driver. Although the driver was initially making some movement and noise, he was losing a large amount of blood and never gave any response to the officer. Because of the smashed nature of the truck, the roof had to be cut off before the driver could be extracted. The driver was pronounced dead at the scene.

¶6      When paramedics arrived and approached Lyman, he was "conscious, breathing, and alert," which one paramedic found "a little bit surprising" considering the "massive impact" of the collision. The paramedic also characterized Lyman as "very calm" and "almost relaxed." Lyman complained of sternum pain, and after the paramedic completed a full-body assessment, he determined further evaluation was necessary, and both Lyman and his grandson were transported to the hospital. The grandson suffered only minor injuries, but further examination of Lyman revealed several broken ribs, a broken sternum, and a collapsed lung. It was also discovered that Lyman was in atrial fibrillation, and doctors eventually had to shock his heart to get it back into a normal rhythm.[1] Police obtained a blood sample from Lyman, which revealed that he had a blood alcohol concentration of 0.12 grams.

¶7      A later examination of the event data recorded by the airbag control module of Lyman's truck showed that Lyman was "travelling 84 miles an hour at the top of the off-ramp," that "[t]he accelerator was at 100 percent," that the truck increased in speed

---

1. Atrial fibrillation "is an irregular and often very rapid heart rhythm." *Atrial Fibrillation*, Mayo Clinic, https://www.mayoclinic.org /diseases-conditions/atrial-fibrillation/symptoms-causes/syc-20350624 [https://perma.cc/5KXB-RTYT]. "During atrial fibrillation, the heart's upper chambers . . . beat chaotically and irregularly" and "out of sync with the lower heart chambers." *Id.* "Episodes of atrial fibrillation may come and go, or they may be constant." *Id.*

to 97 miles an hour before hitting the concrete barrier, that after hitting the barrier "a little bit of [steering] input" registered and the accelerator was completely released, and that the truck "was traveling 89 miles an hour" a few seconds later at the time of the fatal impact.

¶8 As a result of the collision, Lyman was charged with negligently operating a vehicle resulting in death, driving under the influence, failure to stay in one lane, speeding, and failure to obey a traffic control device.[2]

*The Trial*

¶9 The case against Lyman proceeded to trial. During its opening statement, the State asserted that the victim was dead because Lyman "chose to get behind the wheel while he was drunk," "chose to speed down Bangerter [Highway]," and "chose to head down that off-ramp, cross that red light and kill" the victim. The defense in its opening, on the other hand, asserted that although Lyman's blood alcohol concentration was "over the limit," the victim's death "was not the result of Mr. Lyman operating a vehicle in a negligent manner" but, instead, "was the result of a cardiac . . . or heart-related event" that "was not foreseeable."

¶10 The State then proceeded to call witnesses who testified to and elaborated upon the facts stated above. These included multiple eyewitnesses of the accident, as well as various experts.

¶11 One expert called by the State was an accident reconstructionist who had analyzed the event data captured by the airbag control module in Lyman's truck. The accident reconstructionist testified that automobile manufacturers "make it difficult to push" the accelerator down "at 100 percent,"

---

2. The State also initially charged Lyman with reckless driving, but this charge was later dismissed with prejudice.

requiring a person "to bend your foot and push it as hard as you can," and that therefore this takes "a conscious action" and "there has to be input by the driver." He reiterated, "It's not something that's designed to be something that could be done accidentally." He further explained that the steering input that registered after the contact with the concrete barrier was consistent with overcorrecting, gaining control of the vehicle, and continuing on a straightened path, and that in his opinion, such input "wouldn't be consistent with someone who [was] unconscious."

¶12　The State also called a cardiologist to testify. He testified that while atrial fibrillation is "very common," it is "very rare" for atrial fibrillation alone to make someone lose consciousness. He further testified that in those rare cases where atrial fibrillation does cause a loss of consciousness, it is much more likely a case of paroxysmal atrial fibrillation, that is, atrial fibrillation that "was coming and going," as opposed to the persistent atrial fibrillation from which Lyman was suffering. The cardiologist also stated that "there was no evidence of associated other issues" with Lyman's heart that could have combined with the atrial fibrillation to cause Lyman to lose consciousness.

¶13　At the end of the State's presentation of its case, Lyman moved for a directed verdict on the charge of negligently operating a vehicle resulting in death, arguing that the State had failed to "present[] [a] prima facie case to go to the jury." The trial court denied the motion, determining that there was "sufficient evidence presented from which a jury acting reasonably could convict" Lyman of each of the charged offenses.

¶14　The defense then presented its case. The defense called its own accident reconstructionist, whose view of the event data differed from that of the State's reconstruction expert. This accident reconstructionist testified that the steering events that registered after impact with the concrete barrier were "so incredibly small" and "fairly repeated" that they were consistent

with "the tires interacting with the barrier and the electronic stability control being engaged" and did not "indicate meaningful driver input." He also pointed out that the brake pedal was not engaged when Lyman hit the concrete barrier, and he then stated that "it's extremely uncommon for somebody to not go and hit the brakes once some type of an impact event occurs." The accident reconstructionist further testified that it was "theoretically possible" that a driver who was "limp and unconscious" could be applying full pressure to the accelerator so long as the driver was "positioned very close to the dash and . . . ha[d] their foot in that position already" or if, while unconscious, the driver was experiencing a sustained leg contraction during a seizure or other medical event.

¶15 The defense also called its own cardiologist, who held opinions differing from those of the State's medical expert. This cardiologist testified that "due to an issue related to [Lyman's] atrial fibrillation," Lyman "likely experienced loss of consciousness due to a pause in his heart rate that led to reduced blood flow to his brain and caused him to pass out." When questioned as to how many of his patients with atrial fibrillation had experienced passing out, he responded that it was "a common occurrence." But he also testified that of all the people with atrial fibrillation, "the minority of them . . . pass out," and he agreed that losing consciousness was "much more common" with paroxysmal (as opposed to persistent) atrial fibrillation. This cardiologist further testified that it is possible for a person who loses consciousness due to atrial fibrillation to also experience a seizure related to the pause in heartbeat that can stiffen the body.

¶16 Lyman took the stand in his defense. He testified that with some frequency, he was asked to pick up his grandson from kindergarten and keep him until the child's parents were done with work. Lyman also related that on the morning of the accident, he felt like he "was all right" when he left to pick up his

grandson and he did not notice any symptoms of intoxication. As to the accident itself, Lyman testified that the last thing he remembered was talking to his grandson about stopping to pick up chicken nuggets, with this conversation occurring as they were heading toward the off-ramp. Lyman said the last thing that crossed his mind was that he needed to be in the left lane of the off-ramp so that he could turn left to go to the fast food restaurant and that this was just something he knew "automatically" because he had "done it so many times because that's the way home." His next memory, Lyman recounted, was of a paramedic standing next to his vehicle after the accident, asking him questions.

¶17    Lyman's son—the father of the grandson involved in the accident—also briefly testified. He stated that although Lyman was an alcoholic, he was not "a daytime drinker." Lyman's son then began to testify regarding Lyman's relationship with his grandchildren and his frequent attendance at their sporting events. At this point, the State objected on relevance grounds. During an ensuing bench conference, the trial court expressed its concern that the questions might be going "too far afield," and defense counsel explained that he only had a few more questions left and that those questions would address Lyman "picking [his grandson] up from kindergarten, child care, and taking care of him on a regular basis"—specifically, that Lyman had made the same drive "a couple hundred times and there ha[d] never been any issues." The State argued that such testimony would not be relevant and would amount to inappropriate propensity evidence. The court agreed that the testimony was not relevant and that "even if it was relevant, . . . the probative value would be substantially outweighed" due to the fact that the testimony would essentially be "propensity evidence."

¶18    At the end of the defense's case, the trial court instructed the jury. Each side had previously proposed a jury instruction addressing a loss of consciousness. The instruction proposed by

Lyman read as follows: "A person is not negligent if he is stricken by a sudden unforeseeable medical condition that rendered him incapable of controlling his vehicle." The State's proposed instruction, on the other hand, would have told the jury that Lyman's assertion of an unforeseen medical condition was "an affirmative defense" and that, "[a]s such, [Lyman bore] the burden of establishing that the alleged unforeseen medical condition constitute[d] the sole proximate cause of the accident and the resulting death." The court declined to give either proposed instruction, reasoning that neither was based on established Utah law. But the court did instead provide its own instruction addressing intervening causes generally:

> The proximate cause of an injury or death is that cause, which in the natural and continuous sequence, and which is unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred. It is the efficient cause—the one that necessarily sets in operation the factors that accomplish the injury.

> An intervening cause is an independent event, not reasonably foreseeable, that completely breaks the connection between fault and injury.

> . . . .

> The mere fact that an unfortunate and fatal accident happened in which [Lyman] was involved, considered alone, does not prove and does not support an inference that [he] is guilty of the crimes charged.

¶19 The jury instructions also included instructions listing the elements of the charged crimes. The elements instruction for the charge of negligently operating a vehicle resulting in death listed the elements as follows: (1) Lyman, (2) "[o]perated a vehicle in a

negligent manner causing the death of" the victim, and (3) "[h]ad sufficient alcohol in his body such that a subsequent chemical test showed a blood or breath alcohol concentration of .05 grams or greater at the time of the test." And the next jury instruction stated "that 'negligence' means failing to exercise that degree of care which reasonable and prudent persons exercise under like or similar circumstances." Additionally relevant to this appeal is an instruction—made over Lyman's objection and placed immediately following the elements instruction for the speeding count—that stated as follows: "Any speed in excess of the posted 55 MPH speed limit at the intersection of Bangerter Highway and 9000 South is prima facie evidence that the speed is not reasonable or prudent and that it is unlawful."

¶20 The jury convicted Lyman as charged. Lyman then moved to arrest judgment for the verdict on the charge of negligently operating a vehicle resulting in death. The trial court denied the motion, again determining that the State had "presented sufficient evidence from which the jury could have concluded that [Lyman] negligently operated a vehicle causing the death of" the victim. Lyman timely appealed, asking this court to reverse his conviction of negligently operating a vehicle resulting in death and remand his case for a new trial on that count.

ISSUES AND STANDARDS OF REVIEW

¶21 Lyman first challenges the trial court's denials of his motion for directed verdict and his motion to arrest judgment, both of which were based on an argument that there was insufficient evidence to prove that the collision was the result of negligence. "We review a [trial] court's grant or denial of a motion for directed verdict and to arrest judgment for correctness." *State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251. "We will uphold a denial of the motion for directed verdict based on an insufficiency of the evidence claim, if, when viewed in the light most favorable to the State, some evidence exists from which a reasonable jury

could find that the elements of the crime had been proven beyond a reasonable doubt." *Id.* (quotation simplified).

¶22 Next, Lyman argues that the trial court erred in declining to give his proposed jury instruction regarding an unforeseeable medical condition, arguing that this instruction was "a necessary clarification to provide the jury." "If the jury instructions are legally correct, the precise wording and specificity of jury instructions is left to the sound discretion of the trial court." *State v. Hunt*, 2025 UT 54, ¶ 45, 582 P.3d 772 (quotation simplified). And "[w]hether to give an additional clarifying instruction is the type of decision that falls within a [trial] court's discretion." *Id.* ¶ 47. "Jury instruction issues that fall within the [trial] court's discretion will, of course, be subject to an abuse of discretion standard." *Id.* ¶ 45.

¶23 Lyman also asserts that the trial court erred in instructing the jury that any speed over 55 miles per hour "is prima facie evidence that the speed is not reasonable or prudent" and that this instruction "unconstitutionally shift[ed] the burden to the defense." "The propriety of a jury instruction presents a question of law which we review for correctness." *State v. Crowley*, 2014 UT App 33, ¶ 4, 320 P.3d 677 (quotation simplified).

¶24 Finally, Lyman asserts that the trial court erred in sustaining an objection to his son's testimony that Lyman had made the drive to pick up his grandson hundreds of times before with no issue. "The appropriate standard of review for a [trial] court's decision to admit or exclude evidence is abuse of discretion. . . . If the [trial] court applies the correct legal standard, it abuses its discretion only when its decision to admit or exclude evidence is beyond the limits of reasonability." *State v. Green*, 2023 UT 10, ¶ 43, 532 P.3d 930 (quotation simplified).

ANALYSIS

I. Sufficiency of the Evidence

¶25    Lyman argues that the trial court should have granted his motion for directed verdict and his motion to arrest judgment based on the insufficiency of the evidence to support a determination that the collision was the result of his negligence. The bar that Lyman must clear to succeed on these arguments on appeal is significant. "A defendant seeking a directed verdict must show that, when viewed in the light most favorable to the State, *no evidence* existed from which a reasonable jury could find beyond a reasonable doubt that the defendant committed the crime." *State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251 (quotation simplified). "Similarly, we reverse the denial of a motion to arrest judgment only if the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." *Id.* ¶ 31 (quotation simplified).

¶26    Lyman's argument hinges on his assertion that the State's evidence failed to "prove it was not a 'real possibility' that Lyman lost consciousness." The State responds by asserting that (1) it presented evidence sufficient to show that Lyman *did not* lose consciousness and (2) even if the jury believed that Lyman *did* lose consciousness, there was sufficient evidence showing that Lyman was driving negligently *before* he lost consciousness and that this negligent driving was the proximate cause of the victim's death. We agree with the State's argument on both fronts.

¶27    First, the State presented sufficient evidence that, when seen in the light most favorable to the State, would support a reasonable jury finding beyond a reasonable doubt that Lyman did not lose consciousness. It was essentially uncontested that Lyman was travelling nearly 30 miles over the speed limit as he entered the off-ramp, had the accelerator pressed completely to

the floor, turned abruptly in front of another vehicle, reached a speed of 97 miles per hour, swiped a concrete barrier, straightened out, ran over a concrete divider to go straight when a turn was required, ran a red light, and then hit the victim's truck at 89 miles per hour, sending it flying off the road. It was also uncontested that at the time of the collision, Lyman had a blood alcohol concentration of more than double the legal limit. The State additionally presented expert testimony that fully pressing down the accelerator would require conscious effort and that event data recorded by Lyman's truck indicated that Lyman overcorrected and straightened out his truck after swiping the concrete barrier—actions that would support a reasonable inference that Lyman did not pass out as he negotiated the off-ramp. And the State's medical expert further testified that it was "very rare" for atrial fibrillation alone to make someone lose consciousness—particularly the type of atrial fibrillation that Lyman was experiencing.

¶28 Lyman pushes back, asserting that the evidence presented by the State did not "rule out the real possibility that Lyman lost consciousness." But disproving such a possibility is not required; the jury needed to be firmly convinced that Lyman was guilty of the crimes charged, and it could have come to that conviction even if the State's witnesses did not definitely rule out a possibility the defense suggested. *See State v. Reyes*, 2005 UT 33, ¶ 37, 116 P.3d 305 ("Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt." (quotation simplified)). Thus, the State was not required to conclusively disprove the defense's theory of the case to obtain a conviction. And whether the theoretical possibility presented by the defense was a "real possibility" under the facts of this case—that is, a possibility that prevented the jury from being firmly convinced of Lyman's guilt—is a question solely for the jury.

¶29    Second, we agree that even if the jury was ultimately persuaded by the defense's argument that Lyman lost consciousness due to atrial fibrillation, that is not entirely inconsistent with a finding that Lyman's negligent driving caused the victim's death. In other words, the jury could have considered that Lyman entered the off-ramp going nearly 30 miles over the highway speed limit while still accelerating at full throttle, and it could have then reasonably concluded that but for such negligent driving, the victim would not have died. That is, the jury could have concluded that had Lyman been driving in a more reasonable manner as he exited, his later loss of consciousness would not have led to such a tragic result.

¶30    Under either possibility, the State presented sufficient evidence from which a reasonable jury could find beyond a reasonable doubt that Lyman negligently operated a vehicle resulting in death. And the evidence, when viewed in the light most favorable to the verdict, was not so inconclusive that a reasonable juror must have had a reasonable doubt as to Lyman's negligence.

## II. The Proposed Jury Instruction Regarding an Unforeseeable Medical Condition

¶31    Lyman next argues that the trial court erred in declining to instruct the jury regarding an unforeseeable medical condition. While he does not argue that the jury instructions given by the court were legally incorrect, he does assert that the instructions were ambiguous and in need of further clarification. In his view, without his requested instruction there were multiple ways "reasonable jurors could have believed [his] defense but still convicted based on a reasonable but incorrect understanding of the law." We disagree with this assessment.

¶32    As an initial matter, we agree that each jury instruction must correctly state the law and that the instructions as a whole must also be correct. That is, the interaction between multiple

legally correct jury instructions should not create confusion for the jury. *See State v. Hutchings*, 2012 UT 50, ¶ 23, 285 P.3d 1183 ("[A]lthough neither instruction was incorrect as a matter of law, using them together with no explanation or clarification as to their applicability created the potential for confusion and could have misled the jury."). But we do not agree that the jury instructions here resulted in the confusion that Lyman argues was present.

¶33    Lyman argues that "[t]he instructions left ambiguous the question of whether Lyman's negligence had to cause the [victim's] death or whether it was enough that his" operation of a vehicle caused the death. Lyman asserts that the jury could have thought his "driving caused the accident" just because "his truck crashed into" the victim's truck, even if the jury was convinced that his undiagnosed medical condition caused the accident. But the elements instruction given to the jury clearly stated that the State was required to prove that Lyman "[o]perated a vehicle *in a negligent manner* causing the death of" the victim. (Emphasis added.) This statement clearly conveyed that simply being behind the wheel did not alone meet the elements of negligently operating a vehicle resulting in death. Moreover, part of the intervening-cause jury instruction given by the trial court further clarified this point: "The mere fact that an unfortunate and fatal accident happened in which [Lyman] was involved, considered alone, does not prove and does not support an inference that [he] is guilty of the crimes charged."

¶34    Lyman also argues that the jury could have determined that simply driving with a blood alcohol concentration over the legal limit was enough to satisfy the negligence requirement. But again, the elements instruction specified that a guilty verdict required a finding that Lyman "[o]perated a vehicle in a negligent manner causing the death of" the victim *and* that Lyman "[h]ad sufficient alcohol in his body such that a subsequent chemical test showed a blood or breath alcohol concentration of .05 grams or greater at the time of the test." Thus, the jury was clearly

instructed that these were distinct and separate required findings for a conviction and that the State needed to prove the required negligence in operating a vehicle that caused a death.

¶35    The real issue here is whether the trial court was required to instruct the jury regarding the defense Lyman wanted to assert—that his undiagnosed medical condition, as opposed to any conscious and negligent driving, was the true cause of the collision. And the court's instruction on intervening causes sufficiently stated the law on this point and allowed Lyman to argue his theory of the case. The instruction explained that "[t]he proximate cause of an injury or death is that cause, which in the natural and continuous sequence, and *which is unbroken by an efficient intervening cause*, produces the injury, and without which the result would not have occurred." (Emphasis added.) And the instruction told the jury that "[a]n intervening cause is an independent event, not reasonably foreseeable, that completely breaks the connection between fault and injury." Thus, if the jury was convinced that Lyman lost consciousness due to his undiagnosed atrial fibrillation and that this broke any connection between his prior driving and the collision, this instruction correctly and adequately told the jury that Lyman's driving was not a proximate cause of the victim's death.

¶36    Thus, this is not a case where the jury instructions as given "may have confused the jury's understanding" and allowed them to convict based on an incorrect understanding of the law. *Hutchings*, 2012 UT 50, ¶ 19. Moreover, the instruction proposed by Lyman was *not* a complete statement of the law. His requested instruction stated, "A person is not negligent if he is stricken by a sudden unforeseeable medical condition that rendered him incapable of controlling his vehicle." This would have suggested to the jury that had an undiagnosed medical condition caused Lyman to pass out, negligence could not be found in this case. But the law as to intervening causes is more nuanced than that, and it is entirely possible that a driver's prior negligent driving before a

medical issue reveals itself is of such a nature that the medical issue is insufficient to break the causal chain between the prior negligent driving and the accident. *See* 57A Am. Jur. 2d Negligence § 555 ("In order to become a superseding cause or to insulate a prior negligent actor from liability, an intervening cause must be one which breaks the sequence or causal chain or connection between the original negligent or wrongful act and the injury, so that the intervening cause may be regarded as independent of the original act in producing the injury. However, the mere occurrence of an intervening cause does not automatically break the chain of causation stemming from the original tortious conduct." (footnotes omitted)); *cf. Richmond v. Bateman*, 2024 UT App 103, ¶ 40, 554 P.3d 341 ("There can be concurrent proximate causes of an injury[,] and . . . the latter fault of one actor should not blot out the consequences of the former, when both were concurrent causes of the accident." (quotation simplified)). Thus, we agree with the trial court that Lyman's instruction was not based on established Utah law.

¶37　Considering all this, the trial court did not exceed its discretion in refusing to give Lyman's requested jury instruction or in instructing the jury as it did on intervening causes generally.

### III. The Jury Instruction Regarding Prima Facie Evidence

¶38　Lyman also challenges the jury instruction that read, "Any speed in excess of the posted 55 MPH speed limit at the intersection of Bangerter Highway and 9000 South is prima facie evidence that the speed is not reasonable or prudent and that it is unlawful." He acknowledges that this language is taken from Utah statute. *See* Utah Code § 41-6a-601(3). But he relies on prior case law to argue that, as a jury instruction, the language "create[d] an unconstitutional mandatory presumption in violation of [his] due process rights." *State v. Crowley*, 2014 UT App 33, ¶ 13, 320 P.3d 677; *see also State v. Chambers*, 709 P.2d 321, 326 (Utah 1985) (considering a jury instruction "that possession of

recently stolen property, in the absence of a satisfactory explanation, is 'prima facie' evidence of theft by the person in possession of the property," and determining that the instruction was unconstitutional because it created "a mandatory rebuttable presumption").

¶39 We recognize that the use of the term "prima facie" in the challenged instruction was problematic because, as this court has previously explained, this term "refers to the standard by which the trial court—not the jury—determines whether the evidence presented warrants submission to the jury" and "in criminal cases where the burden remains on the State throughout the case, the jury should not be involved in such considerations." *Crowley*, 2014 UT App 33, ¶ 10 (quotation simplified). Without further explanation, such language does not simply allow "a permissive inference" but, instead, creates "an unconstitutional mandatory presumption" in favor of the State. *Id.* ¶ 13.

¶40 We also recognize that although this instruction immediately followed the instruction with the elements of the speeding charge and was apparently meant to provide information only for that charge (a conviction that Lyman does not challenge on appeal), the use of the "reasonable and prudent" phrase in both this challenged instruction and the separate instruction defining negligence might have caused the jury to tie the information about prima facie evidence to the negligence determination underlying the negligent operation charge (the conviction that Lyman *does* challenge on appeal). That is, we take Lyman's point that this may have created a burden-shifting effect that extended beyond the speeding charge.

¶41 Nonetheless, under the facts of this case, we conclude that instructing the jury in this way was harmless beyond a reasonable doubt. *See generally State v. Benson*, 2014 UT App 92, ¶ 30, 325 P.3d 855 ("To hold a constitutional error harmless, we must be able to declare a belief that the error was harmless beyond a reasonable

doubt." (quotation simplified)). We have previously found a similarly flawed jury instruction harmless beyond a reasonable doubt when "the State's case against [the defendant] did not rely heavily on the presumption contained in the erroneous jury instruction" and "[e]ven without the . . . presumption, the State's case against [the defendant] was strong." *Id.* ¶ 32. And we are convinced that both of these are features of the instant case and support a harmlessness determination here.

¶42 First, the State made no suggestion at trial that simply because Lyman had been driving over 55 miles per hour as he exited from Bangerter Highway that he must have been negligent; instead, the assertion was that "he was negligent the moment he was going 84 with 100 percent throttle on Bangerter [Highway]" and also when he continued down the off-ramp "from 84 to 97 miles per hour with . . . 100 percent throttle on the gas pedal." Nor was there any suggestion of a presumption of negligence; instead, the only presumption discussed at trial was Lyman's presumption of innocence.

¶43 Second, the State's case against Lyman was strong (which is perhaps also the reason why the State made no argument in reliance on a speeding presumption). The State presented substantial evidence of Lyman's negligence beyond a speed limit violation. The State's evidence supported that Lyman was going nearly 30 miles over the speed limit as he exited the highway, that he continued to travel at full throttle for several more seconds as he continued down the off-ramp, that he swerved in front of another vehicle, that he hit a concrete barrier, that he eventually straightened out his truck and proceeded over the concrete divider and into the intersection against a red light, that his atrial fibrillation was unlikely to have rendered him unconscious, and that his blood alcohol concentration was over twice the legal limit. Considering "the robustness of the State's case," *id.*, we conclude that instructing the jury as the trial court did was harmless beyond a reasonable doubt under the circumstances here.

IV. Lyman's Son's Testimony

¶44 Lyman contests the trial court's ruling sustaining the State's objection to his son's anticipated testimony that Lyman had made the drive to pick up his grandson hundreds of times before without incident. Lyman's argument regarding this ruling primarily focuses on the court's characterization of the testimony as propensity evidence. But it is clear that the court was also in agreement with the State's relevance argument, and we therefore affirm on this reasoning alone without addressing the additional reasoning the court discussed regarding propensity.

¶45 The Utah Rules of Evidence provide that evidence is relevant when "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Utah R. Evid. 401. The rules also provide that evidence that does not meet this standard "is not admissible." *Id.* R. 402. And we cannot say that the trial court abused its discretion in excluding Lyman's son's testimony on this ground.

¶46 Lyman asserts that his son's testimony "was highly probative to show that Lyman knew the intersection well and would have anticipated the speed limit, the light, and the turn-only lane." And while that may be true, Lyman's familiarity with the off-ramp and the intersection was simply not a fact "of consequence in determining" whether Lyman negligently operated his vehicle on the day of the accident. *Id.* R. 401. Uncontested evidence clearly showed that the maneuvers Lyman's truck made in traversing the off-ramp did not match those of a reasonable driver navigating a familiar intersection. However, neither side asserted that the reason for this disparity was Lyman's unfamiliarity with the intersection—the State argued that the disparity was due to Lyman's intoxicated driving, and the defense argued that the disparity was due to unconsciousness brought on by Lyman's unforeseen medical

condition. And where testimony regarding Lyman's familiarity with the intersection would not have made either of these asserted positions more or less likely, it would not have been relevant.

¶47 Additionally, even if the testimony the defense wanted to present was somehow minimally probative, it was largely cumulative of statements Lyman himself made in his own testimony. He testified that he had frequently been asked to pick up his grandson from kindergarten and keep him until the child's parents were done with work. Lyman also testified that he "automatically" knew which lane he needed to be in when he was exiting the highway because he had "done it so many times because that's the way home." The jury would therefore have already understood from Lyman's testimony and from the nearness of his home to the intersection that he was familiar with the off-ramp and intersection. Thus, Lyman's son's testimony would have provided evidence of which the jury had already been made aware.

¶48 Considering these points, the trial court did not abuse its discretion in sustaining the objection to Lyman's son's testimony—that is, its decision was not "beyond the limits of reasonability." *State v. Green*, 2023 UT 10, ¶ 43, 532 P.3d 930 (quotation simplified).[3]

---

3. Lyman additionally advances a cumulative error argument. "Cumulative error refers to a number of errors which prejudice a defendant's right to a fair trial. It is used when a single error may not constitute grounds for reversal, but many errors, when taken collectively, do." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 39, 428 P.3d 1038 (quotation simplified). Because we have determined probable error as to only one of the arguments advanced in Lyman's appeal, *see supra* Part III, there are not multiple errors to cumulate. Thus, this doctrine is inapplicable here, and we do not address it further.

CONCLUSION

¶49　The trial court did not err in denying either Lyman's motion for directed verdict or his motion to arrest judgment. Nor did the court abuse its discretion in refusing Lyman's proposed jury instruction regarding an unforeseeable medical condition. And although the court may have erred in allowing the jury to be instructed regarding prima facie evidence of speeding, we determine that any such error was harmless beyond a reasonable doubt. Additionally, the court did not abuse its discretion in excluding Lyman's son's testimony regarding Lyman's familiarity with the intersection where the collision occurred. We therefore affirm.

_____